FILED
JUL 21 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALFREDO R. ALIPIO
NAGBAYAN
CASTILLEJOS
2208 ZAMBALES
REP. OF THE PHILS.

VS.

THE HONORABLE DONALD C. WINTER
SECRETARY OF THE NAVY
DEPARTMENT OF THE NAVY
HUMAN RESOURCES OFFICE
(YOKOSUKA, JAPAN)
PSC 473, BOX 22, N134
FPO AP 96349-0022

Case: 1:08-cv-01251
Assigned To : Leon, Richard J.
Assign. Date : 7/21/2008
Description: Employ Discrim.

COMPLAINT

I filed a discrimination complaint through the United States Department of the Navy, Human Resources Office, (Yokosuka, Japan), PSC 473, Box 22, N134, FPO AP 96349-0022, about the Department's noncompliance in the implementation of Office of Personnel Management's (OPM), about Public Law No. 100-238, Section 110, that provided to any individual meeting the definition of an "employee" as defined at 5 United States Code (USC), section 8331(1) to avail of having to make a deposit to the Civil Service Retirement and Disability Fund (Fund) for those employees of the Federal Government where no timely retirement deductions to the Fund were withheld from their salary. The Department of the Navy under the law, was the sole agent of OPM in this matter, failed to inform me (us) about the law's implementing rules and regulations during the time frame mentioned under the law

RECEIVED
JUL 10 2008
Clerk, U.S. District and Bankruptcy Courts

from January 8, 1988 until January 8, 1990, and when the Navy left the Philippines in November 1993, and later came to know about the law in 2007, and did filed a claim for discrimination. The Department's rejected my claim on the ground that I have no right to come within Title VII of the Civil Rights Act of 1964, as amended pursuant to 29 Code of Federal Regulation (CFR) 1614.103 (c) 4 which provided that "Aliens employed in positions, or who apply for positions, located outside the limits of the United States" are not covered under Title VII.

The dismissal of the complaint read in pertinent part as follows:

> The dismissal of this complaint is not based on the merits of the complaint's claim that he should have been covered under the civil service retirement system. The dismissal of the instant case is based solely on the employee's status as a non-U.S. citizen and therefore he has no standing to file a claim of discrimination under the provisions of reference (c).

Citizenship in the United States-Every sovereign state determine for itself the circumstances which shall be recognize as creating natural or native-born citizenship, as well as the conditions under which an alien may be admitted to membership in its citizen body. Many states adopted their general principle the jus sanguinis, accordingly to which the children take citizenship of the father, or, if illegitimate of the mother. Other states accept the rule of jus soli, according to which a person becomeas a citizen of the state within whose terreitotial limits he is born. This latter rule is constitutionally obligatory upon the United States ("US").

As a result of the Spanish-American War, the US acquired certain territory the inhabitants of which were held to be neither aliens or citizens of the United States.

Spain ceded the Philippine Islands, Guam, and Porto Rico to the US under the terms of the "Treaty of Peace" signed in Paris December 10, 1898.

In England, a citizen was a person who was born in that country and remained under its jurisdiction. In the rest of Europe citizenhsip was determined by parental nationality. The English version was the prevailing assumption in America. These two doctrines existed at the time the US Constitution was written.

The Fourteenth Amendment to the US Constitution, ratified in 1868 the first sentence of the amendment state that "(a)ll persons born or naturalized in the United States" and subject to its jurisdiction are citizens of the US and of the state where they reside. (See Civil War Amendments).

Following the transfer from Spain of the Philippine Islands to the US in Article III of the Treaty of Paris of December 10, 1898, see 30 Stat. 1254, which ended the Spanish American War. President McKinley established a civil authority over the Philippines known as the Philippine Island Commission. The powers and duties of the Commission were set forth in Presidential Instructions to the Commission dated April 7, 1900, and reaffirmed by Executive Order (unnumbered) dated June 21, 1901. By the Act of July 1, 1902, 32 Stat. 691, Congress expressly ratified both the Presidential

Instructions and the Executive Order. See Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 293-94 (1958)

The Presidential Instructions vested the Commission, effective September 1, 1900, with "that part of the power of government in the Philippines Islands which is of a legislative nature" until Congress provided otherwise or a different central government was established.

The Act of July 1, 1902, in addition to ratifying the President's orders establishing the Philippine Commission, clearly indicated that, while the Philippines were subject to the sovereignty of the US, they were not to be deemed a part of the US for purposes of the applicability of Federal statutes generally. Section of the Act of Congress of July 1, 1902 in Public No. 235, it provides:

> An Act to temporarily to provide for the administration of Civil Government in the Philippine Islands, and for other purposes.

Section 1 of the 1902 Act stated as follows:

> The provisions of section 1891 of the Revised Statutes of 1878 shall not apply to the Philippine Islands.

Section 1891, referred to above, provided that:

> The Constitution and all laws of the United States which are not locally inapplicable shall have the same effect within all organized Territories, and in every Territory herafter organized as elsewhere within the United States.

In addition, Congress specifically provided for citizenship for inhabitants of the Philippines that was separate from United States citizenship. Section 4 of the Treaty of Paris contained a listing of Philippine citizenship. It read:

4. That all inhabitants of the Philippine Islands continuing to reside therein who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then reside in said Islands, and their children born subsequent thereto, shall be deemed and held to be citizens of the Philippine Islands and as such entitled to the protection of the United States except such as shall have elected to preserve their allegiance to the Crown of Spain in accordance with the treaty of peace between the United States and Spain signed at Paris December tenth, eighteen hundred and ninety-eight.

The object of these temporary provisions were to maintain the responsibility of the US for the general condqct of the Civil Government prior to the inauguration of the Philippine Commonwealth Government, at the end of which the islands were to become a "state."

Congress passed the so-called "Tydings-McDuffie act," approved by the President on March 24, 1934, called the "Independence Act of 1934." This Act have brought a change in the status of the islands, and thus created the "Commonwealth of the Philippines" attaining its new standing as "COMMONWEALTH OF THE PHILIPPINE ISLANDS," as now a "'state'" though not an independent state. See attached copy of a National Archives reference report relating to US Treaties and International Agreements, part of which, analyzing the status of the newly created "COMMONWEALTH OF THE PHILIPPINE ISLANDS," as part of the Union of American states.

Both the Acts of Congress and the ordinance appended the Constitution of the Commonwealth of the Philippine Islands show clearly that it was intended that full sovereignty over the Philippines was to be retained by the US during the transition

period of ten years (November 15, 1935 to July 3, 1946), provided for in the Act. They show that, while the government of the Philippine Islands was to have a large measure of self-government, they were not to constitute a separate state under the rules of international law. In other words, it was clearly intended that the United States and the Philippine Islands should constitute a singel state.

Therefore, under the default rule in the Treaty of Peace, those born on and after November 15, 1935 but before July 4, 1946, were citizens of the United States under the doctrine of "jus soli," they being borned in the continental US where they reside, and were also citizens of the Philippine Islands (dual citizenship) as called for under the US CONSTITUTION in its Fourteenth Amendment.

I was born in then state of the Commonwealth of the Philippine Islands, on December 19, 1938, with dual citizenship. Thus, I met the conditions of citizenship under the FOURTEENTH AMENDMENT definition of a (US) citizen. In

In Afroyim v. Rush, (1967) the Supreme Court of the United States, held, 5-4, that Congress has no power "to take away an American citizenship without his assent."

Since then I never went into open court (US Court) to renounce any of my dual citizenship.

I am requesting this Honorable court to confirmed my having been born a US citizen under the provision of the "jus soli," doctrine when then Philippine Islands, attained its status as a new state, under title of "COMMONWEALTH OF THE PHILIPPINE ISLANDS" where the state had been clothed with the provisions of the US Constitution, specifically under the Fourteenth Amendments of the US Constitution. I ask for a trial by jury in this case, and am not specifying an amount of money, but, rather ask the Honorable court to confirmed by having been born a US citizen, and thus, the Department of the Navy allow me to have access under the Civil Rights Act of 1964, Title VII, as amended.

Accordingly, the Commission has, consistently held that claims of unlawful discrimination brought by foreign nationals employed by agencies outside the United States do not come within the purview of the EEOC Regulations. Fogarty v. Department of State, Appeal No. 01974143 (August 6, 1998).

As I have proven by evidence that I was born a U.S. citizen by birth, though residing in a foreign country, the cited decision by the Commission is inapplicable to my case.

Enclosures
Printed copy of the treaty of Paris, from Treaties and Other International Agreements of the United States of America, 1776-1949, edited by Charles I. Behans
Copy of a National Archives reference report relating to United States Treaties and International Agreement, analyzing the status of the newly created "Commonwealth of the Philippine Islands."

H
08-1251
RJL

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**
Alfredo R. Alipio

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 99999
**(EXCEPT IN U.S. PLAINTIFF CASES)**

PRO SE NP

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

**DEFENDANTS**
Hon. Donald C. Winter

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ________
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE T...

Case: 1:08-cv-01251
Assigned To : Leon, Richard J.
Assign. Date : 7/21/2008
Description: Employ Discrim.

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** ... FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**☐ A. *Antitrust***
- ☐ 410 Antitrust

**☐ B. *Personal Injury/ Malpractice***
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**☐ C. *Administrative Agency Review***
- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. *Temporary Restraining Order/Preliminary Injunction***

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. *General Civil (Other)* OR ☐ F. *Pro Se General Civil***

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Immigration
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus- Alien Detainee
- ☐ 465 Other Immigration Actions

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

3

| ☐ G. *Habeas Corpus/ 2255* | ☒ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
42 USC 2000

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 **DEMAND $** 0 Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☐ YES ☒ NO If yes, please complete related case form.

**DATE** 7/21/08 **SIGNATURE OF ATTORNEY OF RECORD** NCD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# TREATY OF PEACE (TREATY OF PARIS)

*Signed at Paris December 10, 1898*
*Senate advice and consent to ratification February 6, 1899*
*Ratified by the President of the United States February 6, 1899*
*Ratified by Spain March 19, 1899*
*Ratifications exchanged at Washington April 11, 1899*
*Entered into force April 11, 1899*
*Proclaimed by the President of the United States April 11, 1899*
*Article IX amended by protocol of March 29, 1900*[1]
*Article III supplemented by convention of November 7, 1900*[2]

30 Stat. 1754; Treaty Series 343

The United States of America and Her Majesty the Queen Regent of Spain, in the name of her August Son Don Alfonso XIII, desiring to end the state of war now existing between the two countries, have for that purpose appointed as Plenipotentiaries:

The President of the United States,

William R. Day, Cushman K. Davis, William P. Frye, George Gray, and Whitelaw Reid, citizens of the United States;

and Her Majesty the Queen Regent of Spain,

Don Eugenio Montero Ríos, President of the Senate,

Don Buenaventura de Abarzuza, Senator of the Kingdom and ex-Minister of the Crown,

Don José de Garnica, Deputy to the Cortes and Associate Justice of the Supreme Court,

Don Wenceslao Ramirez de Villa-Urrutia, Envoy Extraordinary and Minister Plenipotentiary at Brussels, and

Don Rafael Cerero, General of Division;

Who, having assembled in Paris, and having exchanged their full powers, which were found to be in due and proper form, have, after discussion of the matters before them, agreed upon the following articles:

[1] TS 344, *post*, p. 622.
[2] TS 345, *post*, p. 623.

Case 1:08-cv-01251-RJL Document 1-3 Filed 07/21/2008 Page 2 of 20



ARTICLE I

Spain relinquishes all claim of sovereignty over and title to Cuba.

And as the island is, upon its evacuation by Spain, to be occupied by the United States, the United States will, so long as such occupation shall last, assume and discharge the obligations that may under international law result from the fact of its occupation, for the protection of life and property.

ARTICLE II

Spain cedes to the United States the island of Porto Rico and other islands now under Spanish sovereignty in the West Indies, and the island of Guam in the Marianas or Ladrones.

ARTICLE III[3]

Spain cedes to the United States the archipelago known as the Philippine Islands, and comprehending the islands lying within the following line:

A line running from west to east along or near the twentieth parallel of north latitude, and through the middle of the navigable channel of Bachi, from the one hundred and eighteenth (118th) to the one hundred and twenty seventh (127th) degree meridian of longitude east of Greenwich, thence along the one hundred and twenty seventh (127th) degree meridian of longitude east of Greenwich to the parallel of four degrees and forty five minutes (4° 45′) north latitude, thence along the parallel of four degrees and forty five minutes (4° 45′) north latitude to its intersection with the meridian of longitude one hundred and nineteen degrees and thirty-five minutes (119° 35′) east of Greenwich, thence along the meridian of longitude one hundred and nineteen degrees and thirty five minutes (119° 35′) east of Greenwich to the parallel of latitude seven degrees and forty minutes (7° 40′) north, thence along the parallel of latitude seven degrees and forty minutes (7° 40′) north to its intersection with the one hundred and sixteenth (116th) degree meridian of longitude east of Greenwich, thence by a direct line to the intersection of the tenth (10th) degree parallel of north latitude with the one hundred and eighteenth (118th) degree meridian of longitude east of Greenwich, and thence along the one hundred and eighteenth (118th) degree meridian of longitude east of Greenwich to the point of beginning.

The United States will pay to Spain the sum of twenty million dollars ($20,000,000) within three months after the exchange of the ratifications of the present treaty.

ARTICLE IV

The United States will, for the term of ten years from the date of the exchange of the ratifications of the present treaty, admit Spanish ships and

[3] For a supplement to art. III, see convention of Nov. 7, 1900 (TS 345), *post*, p. 623.

merchandise to the ports of the Philippine Islands on the same terms as ships and merchandise of the United States.

ARTICLE V

The United States will, upon the signature of the present treaty, send back to Spain, at its own cost, the Spanish soldiers taken as prisoners of war on the capture of Manila by the American forces. The arms of the soldiers in question shall be restored to them.

Spain will, upon the exchange of the ratifications of the present treaty, proceed to evacuate the Philippines, as well as the island of Guam, on terms similar to those agreed upon by the Commissioners appointed to arrange for the evacuation of Porto Rico and other islands in the West Indies, under the Protocol of August 12, 1898,[4] which is to continue in force until its provisions are completely executed.

The time within which the evacuation of the Philippine Islands and Guam shall be completed shall be fixed by the two Governments. Stands of colors, uncaptured war vessels, small arms, guns of all calibres, with their carriages and accessories, powder, ammunition, livestock, and materials and supplies of all kinds, belonging to the land and naval forces of Spain in the Philippines and Guam, remain the property of Spain. Pieces of heavy ordnance, exclusive of field artillery, in the fortifications and coast defences, shall remain in their emplacements for the term of six months, to be reckoned from the exchange of ratifications of the treaty; and the United States may, in the mean time, purchase such material from Spain, if a satisfactory agreement between the two Governments on the subject shall be reached.

ARTICLE VI

Spain will, upon the signature of the present treaty, release all prisoners of war, and all persons detained or imprisoned for political offences, in connection with the insurrections in Cuba and the Philippines and the war with the United States.

Reciprocally, the United States will release all persons made prisoners of war by the American forces, and will undertake to obtain the release of all Spanish prisoners in the hands of the insurgents in Cuba and the Philippines.

The Government of the United States will at its own cost return to Spain and the Government of Spain will at its own cost return to the United States, Cuba, Porto Rico, and the Philippines, according to the situation of their respective homes, prisoners released or caused to be released by them, respectively, under this article.

---

[4] TS 343½, *ante*, p. 613.

Case 1:08-cv-01251-RJL Document 1-3 Filed 07/21/2008 Page 4 of 20



### ARTICLE VII

The United States and Spain mutually relinquish all claims for indemnity, national and individual of every kind, of either Government, or of its citizens or subjects, against the other Government, that may have arisen since the beginning of the late insurrection in Cuba and prior to the exchange of ratifications of the present treaty, including all claims for indemnity for the cost of the war.

The United States will adjudicate and settle the claims of its citizens against Spain relinquished in this article.

### ARTICLE VIII

In conformity with the provisions of Articles I, II, and III of this treaty, Spain relinquishes in Cuba, and cedes in Porto Rico and other islands in the West Indies, in the island of Guam, and in the Philippine Archipelago, all the buildings, wharves, barracks, forts, structures, public highways and other immovable property which, in conformity with law, belong to the public domain, and as such belong to the Crown of Spain.

And it is hereby declared that the relinquishment or cession, as the case may be, to which the preceding paragraph refers, cannot in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds, of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories renounced or ceded, or of private individuals, of whatsoever nationality such individuals may be.

The aforesaid relinquishment or cession, as the case may be, includes all documents exclusively referring to the sovereignty relinquished or ceded that may exist in the archives of the Peninsula. Where any document in such archives only in part relates to said sovereignty, a copy of such part will be furnished whenever it shall be requested. Like rules shall be reciprocally observed in favor of Spain in respect of documents in the archives of the islands above referred to.

In the aforesaid relinquishment or cession, as the case may be, are also included such rights as the Crown of Spain and its authorities possess in respect of the official archives and records, executive as well as judicial, in the islands above referred to, which relate to said islands or the rights and property of their inhabitants. Such archives and records shall be carefully preserved, and private persons shall without distinction have the right to require, in accordance with law, authenticated copies of the contracts, wills and other instruments forming part of notarial protocols or files, or which may be contained in the executive or judicial archives, be the latter in Spain or in the islands aforesaid.

ARTICLE IX

Spanish subjects, natives of the Peninsula, residing in the territory over which Spain by the present treaty relinquishes or cedes her sovereignty, may remain in such territory or may remove therefrom, retaining in either event all their rights of property, including the right to sell or dispose of such property or of its proceeds; and they shall also have the right to carry on their industry, commerce and professions, being subject in respect thereof to such laws as are applicable to other foreigners. In case they remain in the territory they may preserve their allegiance to the Crown of Spain by making, before a court of record, within a year from the date of the exchange of ratifications of this treaty,[a] a declaration of their decision to preserve such allegiance; in default of which declaration they shall be held to have renounced it and to have adopted the nationality of the territory in which they may reside.

The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress.

ARTICLE X

The inhabitants of the territories over which Spain relinquishes or cedes her sovereignty shall be secured in the free exercise of their religion.

ARTICLE XI

The Spaniards residing in the territories over which Spain by this treaty cedes or relinquishes her sovereignty shall be subject in matters civil as well as criminal to the jurisdiction of the courts of the country wherein they reside, pursuant to the ordinary laws governing the same; and they shall have the right to appear before such courts, and to pursue the same course as citizens of the country to which the courts belong.

ARTICLE XII

Judicial proceedings pending at the time of the exchange of ratifications of this treaty in the territories over which Spain relinquishes or cedes her sovereignty shall be determined according to the following rules:

1. Judgments rendered either in civil suits between private individuals, or in criminal matters, before the date mentioned, and with respect to which there is no recourse or right of review under the Spanish law, shall be deemed to be final, and shall be executed in due form by competent authority in the territory within which such judgments should be carried out.

2. Civil suits between private individuals which may on the date mentioned be undetermined shall be prosecuted to judgment before the court

[a] For an extension of time for declaration of intention to retain Spanish nationality, see protocol of Mar. 29, 1900 (TS 344), *post*, p. 622.

Case 1:08-cv-01251-RJL Document 1-3 Filed 07/21/2008 Page 6 of 20



in which they may then be pending or in the court that may be substituted therefor.

3. Criminal actions pending on the date mentioned before the Supreme Court of Spain against citizens of the territory which by this treaty ceases to be Spanish shall continue under its jurisdiction until final judgment; but, such judgment having been rendered, the execution thereof shall be committed to the competent authority of the place in which the case arose.

### Article XIII

The rights of property secured by copyrights and patents acquired by Spaniards in the Island of Cuba, and in Porto Rico, the Philippines and other ceded territories, at the time of the exchange of the ratifications of this treaty, shall continue to be respected. Spanish scientific, literary and artistic works, not subversive of public order in the territories in question, shall continue to be admitted free of duty into such territories, for the period of ten years, to be reckoned from the date of the exchange of the ratifications of this treaty.

### Article XIV

Spain shall have the power to establish consular officers in the ports and places of the territories, the sovereignty over which has been either relinquished or ceded by the present treaty.

### Article XV

The Government of each country will, for the term of ten years, accord to the merchant vessels of the other country the same treatment in respect of all port charges, including entrance and clearance dues, light dues, and tonnage duties, as it accords to its own merchant vessels, not engaged in the coastwise trade.

This article may at any time be terminated on six months' notice given by either Government to the other.

### Article XVI

It is understood that any obligations assumed in this treaty by the United States with respect to Cuba are limited to the time of its occupancy thereof; but it will upon the termination of such occupancy, advise any Government established in the island to assume the same obligations.

### Article XVII

The present treaty shall be ratified by the President of the United States, by and with the advice and consent of the Senate thereof, and by Her Majesty the Queen Regent of Spain; and the ratifications shall be exchanged at Washington within six months from the date hereof, or earlier if possible.

In faith whereof, we, the respective Plenipotentiaries, have signed this treaty and have hereunto affixed our seals.

Done in duplicate at Paris, the tenth day of December, in the year of Our Lord one thousand eight hundred and ninety eight.

| | |
|---|---|
| William R. Day | [seal] |
| Cushman K. Davis | [seal] |
| Wm. P. Frye | [seal] |
| Geo. Gray | [seal] |
| Whitelaw Reid | [seal] |
| Eugenio Montero Ríos | [seal] |
| B. de Abarzuza | [seal] |
| J. de Garnica | [seal] |
| W. R. de Villa Urrutia | [seal] |
| Rafael Cerero | [seal] |

the British Empire, France, and Japan relating to their insular possessions and insular dominions in the region of the Pacific Ocean, 43 Stat. 1646; 4 Treaties, etc. (Trenwith, 1938) 4883). Replying on April 3, 1924 the Department of State said:

> The controversies referred to in [the treaty] . . . do not, as indicated in the declaration accompanying the Treaty, embrace questions which, under the principles of international law, lie exclusively within the domestic jurisdiction of the respective powers. The question whether independence shall be granted to the Philippine Islands is one which lies exclusively within the domestic jurisdiction of the United States. I, therefore, do not consider that the Treaty mentioned, the declaration accompanying the Treaty, or the Treaty supplementary thereto, concluded February 6, 1922, in any manner affect the exclusive right of this Government to withhold or to grant independence to the Islands in question.

Representative Fairfield to Secretary Hughes, Mar. 25, 1924, and Mr. Hughes to Mr Fairfield, Apr. 3, 1924, MS. Department of State, file 811b.01/63.

No treaty obligation

In a communication of October 3, 1930, addressed to the Department of State, it was asked whether there was any obligation under any treaty entered into at any time on the part of the United States, either with Spain or directly with the Philippine people, wherein the United States was in any manner bound to a promise of independence of the Islands. Replying on October 10, 1930 the Department said that—

> there is no treaty provision by which the United States promises the independence of the Philippine Islands. Such independence lies wholly in the discretion of the United States to be exercised through the appropriate Constitutional method. The United States has made no agreement on the subject nor has there been any authoritative or official promise on the subject by either the executive or Congress. The Sixty-fourth Congress in a preamble to the present Organic Act (Statutes at Large, Vol. 39, Par. 1, p. 545) on this subject and various Presidents have made statements as to the ultimate purpose of the United States in certain circumstances or conditions. No such statements, of course, constitute an official commitment of the Government.

Representative McCormick to the Department of State, Oct. 3, 1930, and Assistant Secretary Castle to Mrs. McCormick, Oct. 10, 1930, MS. Department of State, file 811b.01/139.

Act of 1933

On January 17, 1933 the so-called "Hare-Hawes-Cutting act", to enable the people of the Philippine Islands to adopt a constitution and form a government, to provide for the independence of the islands, and for other purposes, was passed by Congress over a presidential veto (47 Stat. 761–770). The act provided that it should not

High Commissioner

The act authorizes the President to appoint, by and with the advice and consent of the Senate, a United States High Commissioner to the government of the Commonwealth of the Philippine Islands, to be the representative of the President in the Islands, to have access to the records of the government of the Commonwealth, and to be furnished by the Chief Executive of the Commonwealth with such information as he shall request. The government of the Commonwealth is authorized to be represented in the United States by a Resident Commissioner with a non-voting seat in the House of Representatives. (Sec. 7.)

Independence in ten years

Section 10 of the act stipulates that on the fourth day of July immediately following the expiration of a period of ten years from the date of the inauguration of the government of the Commonwealth, the President of the United States "shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty then existing and exercised by the United States in and over the territory and people of the Philippine Islands . . . and, on behalf of the United States, shall recognize the independence of the Philippine Islands as a separate and self-governing nation and acknowledge the authority and control over the same of the government instituted by the people thereof, under the constitution then in force".

Neutralization

Section 11 requests the President of the United States, at the earliest practicable date, to enter into negotiations with foreign powers with a view to the conclusion of a treaty for the perpetual neutralization of the Philippine Islands, if and when Philippine independence shall have been achieved. Section 12 provides that upon the proclamation and recognition of the independence of the Philippine Islands, the President shall notify foreign governments thereof and invite their recognition of such independence.

Section 15 repeals certain laws and parts of laws and provides for the continuance in force of others until they shall be altered, amended, or repealed by the Legislature of the Commonwealth of the Philippine Islands or by the Congress of the United States.

A concurrent resolution accepting the act was adopted by the Senate and House of Representatives of the Philippine Legislature in joint session on May 1, 1934.

Constitution approved

A Constitution of the Philippines was adopted by a Philippine constitutional convention on February 8, 1935. On March 23, 1935, the President of the United States notified the Governor General of the Philippine Islands that the proposed Constitution had been submitted to him and that he certified that "the same conforms substantially with the provisions of the Act of Congress approved March 24, 1934".





with respect to their financial operations and their currency; and we continue to control their foreign relations. The power of review by this court over Philippine cases, as now provided by law, is not only continued, but is extended to all cases involving the Constitution of the Commonwealth of the Philippine Islands.

Thus, while the power of the United States has been modified, it has not been abolished. Moral responsibilities well may accompany the process of separation from this country; and, indeed, they may have been intensified by the new and perplexing problems which the Philippine people now will be called upon to meet as one of its results. The existence and character of the consequent obligations and the extent of the relief, if any, which should be afforded by the United States in respect of them, are matters, not for judicial but for Congressional consideration and determination.

301 U.S. (1937) 308, 313-314, 319-320.

Diplomatic formalities

As to the honors which should be accorded the President of the Philippine Commonwealth during a visit to a foreign state the Department of State on January 29, 1937 said that—

the Philippine Commonwealth is not an independent state and its President is not entitled to the honors usually accorded to a chief of state. Sovereignty of the Philippine Islands remains with the United States and the only official of the United States entitled to such honors is the President of the United States. When the Commonwealth Government was inaugurated, it was decided that the High Commissioner to the Philippine Islands, representing the President of the United States, should have precedence over the President of the Commonwealth and that both of those officials should be entitled in the Philippines to salutes of 19 guns.

Until such time as the Philippine Commonwealth becomes entirely free and independent of the United States, it is expected that when honors are rendered any official of the Philippine Commonwealth, the flag of the United States be displayed.

Secretary Hull to Ambassador Johnson, Jan. 29, 1937 (telegram), MS. Department of State, file 811b.001 Quezon, Manuel L./55.

In circular instructions to certain diplomatic and consular officers on Apr. 28, 1937 Assistant Secretary Carr said:

"A ruling was made at the time of the inauguration of the Commonwealth Government establishing the rank of the President of the Philippine Commonwealth as analogous to that of a Governor of a State and providing that the President of the Commonwealth would rank with, but after, the United States High Commissioner to the Philippines.

"This same ruling also prescribed that both the United States High Commissioner and the President of the Philippine Commonwealth would be entitled to a salute of nineteen guns in Philippine territory or Philippine waters, on which occasion only the flag of the United States should be flown. In consequence, the President of the Philippine Commonwealth has





between the Philippine Islands and the United States during the transition period, while the United States remains sovereign in the islands. These provisions accord with the provisions contained in Section 2(a) of the Act of March 24, 1934. Thus the language of the 10th subsection of Section 1 of the ordinance is the same in phraseology as that of Section 2(a) (10) of the Act of March 24, 1934.

Philippines not a sovereign state

Both the Acts of Congress and the ordinance appended to the Constitution of the Philippines show clearly that it was intended that full sovereignty over the Philippines was to be retained by the United States during the transition period of ten years provided for in the Act. They show that, while the government of the Philippine Islands was to have a large measure of self-government, they were not to constitute a separate sovereign state under the rules of international law. In other words, it was clearly intended that the United States and the Philippine Islands should continue to constitute a single state. This is made clear, not only by the provision that the foreign affairs of the Philippines "shall be under the direct supervision and control of the United States", but also by the various other provisions contained in the Act, and repeated in the ordinance appended to the Constitution setting forth in detail the continued authority and responsibility of the United States in the Philippines during the transition period. Among them is the provision, to which special attention has already been called, under which the President of the United States may intervene for the preservation of the government of the Commonwealth of the Philippines, for the protection of life, property and liberty and "for the discharge of government obligations under and in accordance with the provisions of the constitution". . . .

. . . it is believed that it is the intent of the statutory provision in question that foreign affairs pertaining to the Philippine Islands are to be conducted and not merely supervised by the United States. The use of the adjective "direct" before the word "supervision" and the addition of the words "and control" seem to emphasize this point. Needless to say, the Government of the United States, acting through the High Commissioner to the Commonwealth of the Philippine Islands, may call upon the government of the latter for cooperation and assistance in matters pertaining to foreign affairs, including the extradition of criminals, as well as the protection of aliens in the islands, but it is believed that communications between the government of the islands and foreign governments must be carried on through the High Commissioner.

It may be well to make mention of the following provision of Section 12(9) of Article VIII of the Constitution of the Philippines:

"The President shall have power, with the concurrence of a majority of all the Members of the National Assembly, to make treaties, and with the consent of the Commission on appointments, he shall appoint ambassadors, other public ministers and





should, during the period in which the United States retains sovereignty over the Philippines, deal directly with foreign governments in matters relating to the extradition of criminals.

The Acting Attorney General (Keenan) to the Secretary of State (Hull), Apr. 30, 1936, MS. Department of State, file 200.11B/13; Mr. Hull to Attorney General Cummings, May 26, 1936, *ibid.* 200.11B/16, enclosing a memorandum prepared in the Office of the Legal Adviser (200.11B/15).

With reference to the question of granting a visa to a member of the household of President Quezon of the Philippine Commonwealth, the Department of State on June 3, 1937 said:

"Philippine Government officials are considered to be foreign government officials for visa purposes in view of [the] language of [the] Philippine Independence Act."

Secretary Hull to Consul General Southard, June 3, 1937 (telegram), MS. Department of State, file 811.111 Diplomatic/10231.

## GUANO ISLANDS

### §77

The Department of State expressed the following opinion in 1907 regarding the legal status of guano islands appertaining to the United States:

> . . . the United States possess no sovereign or territorial rights over guano islands. United States citizens who discover guano, or their assigns, are protected by this Government in the prosecution of their enterprise which extends only to appropriation and disposal of the guano thereon. This protection is extended under the Acts of Congress on the subject, compiled in Title 72 of the Revised Statutes of the United States.

The Assistant Secretary of State (Bacon) to Messrs. Dudley and Michener, Jan. 3, 1907, MS. Department of State, file 3120.

To the same effect, see: the Acting Secretary of State (Adee) to Mr. Miles Carpenter, July 2[illegible], 1907, *ibid.* Minor File, vol. 12; the Third Assistant Secretary of State (Phillips) to Mr. H. M. Walker, July 13, 1914, *ibid.* file 811.0141/1[illegible]; the Acting Secretary of State (Phillips) to Representative John Jacob Rogers, Apr. 28, 1922, *ibid.* 811.0141SW2/77; the Acting Secretary of State ([illegible]) to Mr. R. F. Nichols, Sept. 1, 1932, *ibid.* 811.0141/54.

The act of August 18, 1856 (Sections 5570–78 R.S.; sections 1411–19, Title 48 U.S.C.) does not vest title to any of the Guano Islands to which it applies in the discoverer but merely authorizes the President, in his discretion, to protect the discoverer or his assigns in the exclusive right of occupying such island, rocks or keys for the purpose of obtaining guano and of selling and delivering the same to the United States to be used therein. In Duncan v. Navassa Phosphate Company (137 U.S. 647), the Supreme Court of the United States said, "The whole right con



DEPARTMENT OF THE NAVY
COMMANDER U. S. NAVAL FORCES, JAPAN
PSC 473 BOX 12
FPO AP 96349-0051

N134
DON 08-61581-00850
2 May 08

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

From: Deputy Equal Employment Opportunity Officer, Human Resource Office - Yokosuka, Japan
To: Rufus F. Nobles, Representative for Alfredo R. Alipio, San Narciso, 2205 Zambales, Republic of Philippines, 601

Subj: NOTICE OF DISMISSAL OF FORMAL COMPLAINT OF ALFREDO R. ALIPIO V. THE HONORABLE DONALD C. WINTER, SECRETARY OF THE NAVY, DON # 08-61581-00850

Ref: (a) Formal discrimination complaint dtd 14 Apr 08
(b) Notice of Receipt of Formal Complaint dtd 25 Apr 08
(c) 29 CFR § 1614

Encl: (1) Counselor's Report
(2) Notice of Appeal/Petition (EEOC Form 573)

1. The formal discrimination complaint, identified as reference (a), was received by this office on 25 April 2008, and acknowledged by reference (b).

2. Based upon a review of reference (a), and enclosure (1), and in accordance with reference (d), I am hereby dismissing your client's claim of discrimination for the following reasons:

Your client claims he was discriminated against on the basis of reprisal (based on Public Law No. 100-238, Title I, Section 10) when he was not granted coverage under the civil service retirement system from 8 January 1988 through 8 January 1990, while employed with the U.S. Navy at Subic Bay Philippines.

Your client's claim is dismissed for failure to state a claim.

3. At 29 CFR 1614.103(c)4 it states that "Aliens employed in positions, or who apply for positions, located outside the limits of the United States" are not covered under Title VII. Your client has provided no evidence that he is a U.S. citizen either by birth or naturalized, and therefore does not have standing to file a claim under reference (d). Although he cites that he should be considered an employee, he does not provide documentation that he is a U.S. citizen, which is the issue in determining if the complaint can be accepted for formal

processing under Title VII. This dismissal of the instant case is based solely on the employee's status as a non-U.S. citizen and therefore he has no standing to file a claim of discrimination under the provisions of reference (c). Under the Commission's regulatory pre-complaint procedures, EEO counseling is a mandatory first step to pursuing a claim of discrimination in the EEO process, and the agency must provide the counseling to any "aggrieved person" who requests it. *See* 29 CFR 1614.104. This office has processed your client's pre-complaint as required. The Commission has, consistently held that claims of unlawful discrimination brought by foreign nationals employed by agencies outside the United States do not come within the purview of the EEOC Regulations. *Fogarty v. Department of State,* Appeal No. 01974143 (August 6, 1998); *Bethune v. Panama Canal Commission,* Request No. 05940402, (July 15, 1994); *Howell v. Department of State,* Appeal No. 01930262 (December 18, 1992). Therefore, your client's claim of discrimination is hereby dismissed for failure to state a claim in accordance with 29 CFR 1614.103, 1614.104 and 1614.105.

4. Your client also alleges discrimination on the basis of reprisal. However, your client does not provide information on protected activity he engaged in while employed with the U.S. Navy. To file a complaint on the bases of reprisal, the complaint must allege that he was somehow involved in protected activity involved in raising allegations of discrimination. Since your client has not identified any involvement in the EEO process as a complainant, witness, or as a discloser of alleged discriminatory action, this complaint is also dismissed for failure to state a claim that is actionable under Title V11.

5. As the complainant is not a prevailing party, no attorney fees are awarded in connection with his discrimination complaint.

6. This is the final department of Navy decision on your complaint. If you are dissatisfied with the decision to dismiss the complaint, you may file a notice of appeal with the Equal Employment Opportunity Commission ("the Commission") within

thirty (30) calendar days of your receipt of this decision. Enclosure (2) should be used when filing your appeal. The appeal form should be submitted to:

Director, Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 19848

Washington, D.C. 20036

7. At the same time that you file your appeal with the Commission, you must provide a copy of the appeal and all supporting statements to this office at EEO N134, PSC 473 Box 22, FPO AP 96349-0022, within 30 calendar days of filing the Notice of Appeal, enclosure (2).

8. An appeal shall be deemed filed on the day it is postmarked, or, in the absence of a postmark, on the date it is received by the Commission. The 30 calendar-day time limit within which an appeal must be filed will not normally be extended by the Commission. If the appeal is not submitted within the time limit, the Commission may extend the time limit if a written explanation showing that you were not notified of the prescribed time limit, were not otherwise aware of it, or circumstances beyond your control prevented you from filing the Notice of Appeal within the prescribed time limit. A copy of your explanation must be forwarded to the EEO Office.

9. If you elect not to appeal to the Commission, you may file a civil action in an appropriate U.S. District Court within 90 calendar days of your receipt of this decision. Filing a civil action will result in termination of the administrative processing of your complaint.

10. If you file a civil action under Title VII of the Civil Rights Act of 1964, as amended, or the Rehabilitation Act of 1973, as amended, and do not have, or are unable to obtain the services of a lawyer, you may request the court to appoint a lawyer to represent you. In such circumstances as the court may deem just, the court may appoint a lawyer and ay authorize the commencement of the action without the payment of fees, costs, or security. Any such request must be made within the above-referenced 90 calendar day time limit, for filing suit and in such form and manner as the court may require. Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within 90 calendar days from the date you receive this decision.

11. If you file an appeal with the Commission, you may still file a civil action in U.S. District Court within thirty (3) calendar days of your receipt of the Commission's final decision on y our appeal. A civil action may also be filed any time after 180 calendar days from the date of filing your appeal to

Subj: NOTICE OF DISMISSAL OF FORMAL COMPLAINT OF ALFREDO R. ALIPIO V. THE HONORABLE DONALD C. WINTER, SECRETARY OF THE NAVY, DON # 08-61581-00850

the Commission, if a final decision has not bee issued by the Commission's Office of Federal Operations.

12. You are further notified that if you file a civil action, you must name DONALD C. WINTER, Secretary of the Navy, as the defendant. You must include the name of the person and the official title. Failure to name DONALD C. WINTER, Secretary of the Navy, may result in the loss of any judicial redress you may be entitled to.

13. Thomas LaBelle, EEO Specialist, is the point of contact for this complaint and you may reach him by mail at HRO Yokosuka, PSC 473, Box 22, Code N134, FPO AP 96349-0022, or by email at Thomas.labelle@fe.navy.mil.

JUNARION HUBBARD

Copy to (w/o encl):
(1) Alfredo R. Alipio, Nagbayan, Castillejos, 2208 Zambales, Philippines 601
(2) HRO Yokosuka N133

take effect until it should be accepted by the Philippine Legislature or by a convention called for that purpose. The first section of the act was not accepted.

H. Rept. 968, 73d Cong., 2d sess., pp. 2, 3.

Congress passed another act, the so-called "Tydings-McDuffie act", approved by the President on March 24, 1934, providing for the complete independence of the Philippine Islands upon the expiration of a period of ten years from a specified date and upon compliance with certain conditions. This act, like that of 1933, was not to take effect until accepted by the Philippine Legislature or by a convention called for that purpose by the Legislature. It authorizes the Philippine Legislature to provide for the election of delegates to a constitutional convention to formulate and draft a Constitution "for the government of the Commonwealth of the Philippine Islands". Section 2 provides that the Constitution shall be republican in form, shall contain a bill of rights, and shall provide that, "pending the final and complete withdrawal of the sovereignty of the United States" over the Islands, all citizens and officers of the Philippine Islands shall owe allegiance to the United States. Pending the attainment by the Islands of complete independence, all acts of the Legislature of the Commonwealth are to be reported to the Congress of the United States and certain acts, namely, those relating to currency, coinage, imports, and immigration, are not to become effective until approved by the President of the United States. Section 2 further provides that meanwhile the foreign affairs of the Islands "shall be under the direct supervision and control of the United States"; that the decisions of the courts of the Commonwealth shall be subject to review by the Supreme Court of the United States (as now provided by law); and that the United States shall have the right to intervene for the preservation of the government of the Commonwealth, for the protection of life, property, and individual liberty, and for the discharge of government obligations under and in accordance with the provisions of the Constitution.

Independence Act of 1934

Constitution of the Commonwealth

The act provides (sec. 3) that the Constitution to be drafted and approved by the constitutional convention should be submitted to the President of the United States and, if certified by him to conform to the act, to the people of the Philippine Islands for their ratification (sec. 4); that such ratification should be deemed an expression of the will of the people of the Philippine Islands in favor of independence; and that when obtained, and proclaimed by the President of the United States, "the existing Philippine Government shall terminate and the new government shall enter upon its rights", etc.

48 Stat. 456-465; MS. Department of State, file 811b.01/215; H. Doc. 335, 73d Cong., 2d sess.; S. Doc. 43, 74th Cong., 1st sess.

On November 5, 1935 the Minister of the Union of South Africa presented to the Secretary of State an inquiry from the South African Department of Customs and Excise relative to the classification of the Philippine Islands for customs and statistical purposes. The Secretary of State replied that until the President of the United States shall by proclamation withdraw and surrender all right of possession, supervision, jurisdiction, control, or sovereignty in the Philippines as provided in section 10 (*a*) of the Independence Act, sovereignty over the Philippine Islands rests with the United States.

Sovereignty

Secretary Hull to the Minister of the Union of South Africa, Nov. 15, 1935, MS. Department of State, file 811b.01/261. See, to the same effect, the Legal Adviser of the Department of State to Comptroller Peartore of the Department of Administration and Finance of Minnesota, Nov. 25, 1936, *ibid.* 811b.01/304.

In the case of *Cincinnati Soap Co.* v. *United States*, decided by the Supreme Court of the United States on May 3, 1937, involving the constitutionality of an appropriation to the Philippine treasury of certain processing taxes provided for in section 602½ of the Revenue Act of 1934 (48 Stat. 680, 763), the Court said:

> The Philippine Islands and their inhabitants, from the beginning of our occupation, have borne a peculiar relation to the United States. The Islands constitute a dependency over which the United States for more than a generation, has had and exercised supreme power of legislation and administration, *Posadas* v. *National City Bank*, 296, U.S. 497, 502, a power limited only by the terms of the treaty of cession and those principles of the Constitution which by their nature are inherently inviolable.

With reference to the effect of the Philippine Independence Act of 1934, the Court said:

> But it is contended that the passage of the Philippine Independence Act of March 24, 1934, c. 84, 48 Stat. 456, and the adoption and approval of a constitution for the Commonwealth of the Philippine Islands have created a different situation, and that since then, whatever may have been the case before, the United States has been under no duty to make any financial contribution to the islands. Undoubtedly, these acts have brought about a profound change in the status of the islands and in their relations to the United States; but the sovereignty of the United States has not been, and, for a long time may not be, finally withdrawn. So far as the United States is concerned, the Philippine Islands are not yet foreign territory. By express provision of the Independence Act, we still retain powers with respect to our trade relations with the islands, with certain exceptions set forth particularly in the act. We retain powers

not recognized international status and should not be accorded the honors usually given a chief of state. Moreover, he is not entitled to any salutes or honors outside of Philippine territory or Philippine waters.

"If in connection with any ceremony or celebration outside of the Philippines involving the Philippine Islands or one of its officials, the flag of the Philippine Commonwealth is displayed, the flag of the United States should also be flown and given the honor position to the right of (observer's left), or above the Philippine flag.

"The heads of diplomatic missions, as representatives of the President of the United States, take precedence in the countries to which they are accredited over the President of the Philippine Commonwealth.

"It is requested that, when an occasion arises which in your opinion requires such action, the substance of this instruction be brought to the attention of the appropriate authorities."

MS. Department of State, file 811b.01/341a.

In a letter to the Secretary of State on April 30, 1936, with reference to the subject of extradition between the Philippine Islands and foreign countries, the Acting Attorney General said: **Extradition**

> This involves, inter alia, interpretation of the provision in the Philippine Independence Act that "foreign affairs shall be under the direct supervision and control of the United States." [Sec. 2(a) (10), Act of March 24, 1934, 48 Stat. 457.] As a matter of first impression this provision appears to be somewhat indefinite and suggests the question whether the Congress contemplated that the Government of the Commonwealth of the Philippine Islands should deal with foreign nations subject to supervision and control or in just what manner, and by whom, foreign affairs affecting the Philippine Islands should be handled.

The Acting Attorney General having requested the views of the Department of State, the Secretary of State, with a letter dated May 26, 1936, submitted a memorandum reading in part as follows:

> The provision of the 10th subdivision of Section 2(a) of the Act of March 24, 1934, is one of a number of provisions which the bill required should be contained in the Constitution of the Philippines and which should be in effect "pending the final and complete withdrawal of the sovereignty of the United States over the Philippine Islands". The object of these temporary provisions was to maintain the responsibility of the United States for the general conduct of the government of the Philippines during the ten-year transition period, at the end of which the islands were to become completely independent.
>
> . . . It will be observed that the principal part of the Constitution [of the Philippine Islands adopted by the constitutional convention in pursuance of the act of Congress of March 24, 1934], which contains sixteen articles, is drawn in such form that it will become completely effective, without change, when the islands become independent. However, there is appended to the Constitution an ordinance setting forth the special relationship

consuls, and he shall receive ambassadors and other ministers duly accredited to the Government of the Philippines."

It cannot be maintained that the provision just quoted overcomes or in any way limits the provision in the statute and ordinance that during the transition period "foreign affairs shall be under the direct supervision and control of the United States." On the contrary, it is quite clear that the provision of Section 12(9) of Article VII of the Constitution is subject to and limited by the provision of Section 1(10) of the ordinance, just as other provisions in the principal part of the Constitution are, during the said period, subject to and limited by provisions in the ordinance. The whole object of the ordinance is to maintain the authority and responsibility of the United States in the islands during the period in question, and it necessarily follows that they place limitations upon the authority of the government of the Philippines during the same period. . . . It seems clear that, in view of the statutory provision under discussion, the President of the Philippines could not perform these functions unless expressly authorized by the Government of the United States. It has been suggested that Philippine citizens might be sent as commercial agents to foreign countries, but, for the reasons mentioned, the sending of such persons would also be subject to the authorization of the United States. The provision of the Act of March 24, 1934, under consideration evidently covers all matters concerning foreign affairs which pertain to the Philippines.

Diplomatic officers

. . . . . . .

Unfortunately, the report of the Committee on Territories and Insular Affairs of the Senate of March 15, 1934, concerning the bill, S. 3055, which became the Act of March 24, 1934, contains no special discussion of the particular provision of the Statute in question. It may be observed, however, that the report calls attention to the fact that the bill was a "proposal to reenact the Hare-Hawes-Cutting bill" with certain exceptions having no application to the provision now under consideration. In this connection it may further be observed that in the report of the Committee, of February 24, 1932, concerning the Hare-Hawes-Cutting bill, there appears the following passage:

"It is also provided that foreign relations of the Islands shall be *exclusively* under the control and supervision of the United States, and that our Government at any time may intervene to prevent a violation of international obligations." [Italics added.]

The statutory provision in question, as construed in the Committee's report just quoted, is believed to be eminently wise. With regard to the delicate and important functions pertaining to the conduct of foreign affairs, it is impossible to have a divided authority.

For the reasons mentioned, it seems clear that it was not the intent of Congress that the Government of the Philippines